1

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
    Case No. 19-cv-3469-RM-MEH
 3  _____

 4  MELISSA HODGKINS, et al.,

 5       Plaintiffs,

 6  vs.

 7  FRONTIER AIRLINES, INC.,

 8       Defendant.
    _____
 9
10          Proceedings before MICHAEL E. HEGARTY, United

11  States Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 10:59 a.m., May 3, 2021,

13  in the United States Courthouse, Denver, Colorado.

14  _____

15          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                     APPEARANCES

19          SARA NEEL, GALEN SHERWIN and JUNO TURNER and

20  KAREN SEBASKI, Attorneys at Law, appearing for the

21  Plaintiff.

22          STEPHEN BAUMANN, Attorney at Law, appearing

23  for the Defendant.

24  _____

25                  DISCOVERY CONFERENCE
```

2

<pre>
 1                    P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3    proceedings are herein transcribed, pursuant to order of
 4    counsel.)
 5              THE COURT:  Case Number 19-cv-30469, Melissa
 6    Hodgkins, et al. vs. Frontier Airlines.  First in the
 7    courtroom for the plaintiff.
 8              MS. NEEL:  Good morning, Your Honor.  Sara Neel
 9    with the ACLU of Colorado representing the plaintiffs in the
10    case.
11              THE COURT:  Thank you.  And then on the phone for
12    the plaintiffs.
13              MS. SEBASKI:  Karen Sebaski from Holwell Shuster &
14    Goldberg for plaintiffs.
15              THE COURT:  Thank you.
16              MS. TURNER:  Juno Turner from Towards Justice for
17    plaintiffs.
18              THE COURT:  Okay.  And how about in the courtroom
19    for the defense.
20              MR. BAUMANN:  Good morning, Your Honor.  Steve
21    Baumann on behalf of Frontier Airlines.
22              THE COURT:  Are you flying alone?
23              MR. BAUMANN:  I'm sorry, Your Honor.
24              THE COURT:  Are you flying alone today?
25              MR. BAUMANN:  Flying solo.
</pre>

3

1          THE COURT:  All right, good.  You know, which is

2    illegal in a commercial context, but this is kind of private

3    litigation, right, so we're not there.  Okay.

4          COURTROOM DEPUTY:  And Judge, I believe we had just

5    some -- I'm assuming --

6          THE COURT:  Yeah.  Who just signed on?

7          MS. SHERWIN:  You've got Galen Sherwin for the

8    plaintiffs, Your Honor.

9          THE COURT:  Okay, we almost made it.  Okay.  How

10   are you doing, Galen?

11         MS. SHERWIN:  I'm well, thank you, Your Honor.  How

12   are you?

13         THE COURT:  Very good.  Healthy, actually.

14         MS. SHERWIN:  Good.

15         THE COURT:  Okay.  Let's see, each side has issues

16   with the others responses to written discovery requests, and

17   these issue are as follows:  First of all, can't agree on an

18   ESI protocol, which I mean, it's advisory anyway, so it's not

19   mandatory under our local rules, is it?

20         MS. NEEL:  To have an ESI protocol, Your Honor?

21         THE COURT:  Correct.

22         MS. NEEL:  I don't know, although the scheduling

23   order did say that we would enter into an ESI protocol.

24         THE COURT:  That was your language, not mine.  So

25   what's the problem?

4

1          MS. NEEL:  Regarding the protocol, Ms. Sebaski is

2    going to be handling the ESI protocol.  She's been working on

3    that issue more closely.

4          THE COURT:  Okay.

5          MS. SEBASKI:  Good morning, Your Honor.  So as you

6    mentioned, the scheduling order says that the parties will

7    enter an ESI protocol.  In February Frontier agreed to

8    prepare a draft, and when they sent it six weeks later, it

9    was entirely one-sided.  Frontier then refused on two

10   separate conferral calls to enter into a protocol that would

11   obligate Frontier in any way and asked plaintiffs to enter a

12   one-sided protocol.  They now are asking that the parties

13   separately negotiate and the Court enter two separate ESI

14   protocols.

15          And, you know, our position is that for efficiency

16   sake the parties should enter a single mutual ESI protocol

17   that governs ESI sources, addresses processing

18   specifications, protection format, metadata and the like with

19   separately negotiated search terms.  And we believe that, you

20   know, any differences, for example, ESI sources to be trusted

21   can be accounted for in the single protocol without the need

22   for separate documents.

23          In terms of the protocol that Frontier sent to us,

24   you know, it is very problematic, and I'm happy to identify

25   specifically why if the Court would like.

5

1          THE COURT:  How long would that take?

2          MS. SEBASKI:  I don't think it would take too long.

3          THE COURT:  Okay, go ahead.

4          MS. SEBASKI:  Okay.  So -- so what I'll start by

5   saying is that, you know, Frontier's protocol is 15 pages

6   long.  Ten of those pages are search terms to be run over

7   ESI, including social media.  And when we sent back a

8   proposed protocol to Frontier, we marked up those ten pages

9   of search terms in full.

10          There are two additional pages devoted to search

11  terms that are specific to social media and evoking an

12  emotional -- terms that evoke an emotional response.  Those

13  terms, you know, are overly broad and we're looking to have

14  targeted terms that are directed to items that may bear on

15  emotional distress.

16          But in terms of the remaining three pages,

17  Frontier's protocol would require preapproval of our

18  discovery vendor and review platform.  We've long since

19  engaged a discovery vendor who has, you know, nearly

20  completed a very fulsome document collection, which I'm also

21  happy to elaborate on.

22          Frontier's proposal requires the entirety of

23  plaintiffs' social media timelines, posted pictures, tweets,

24  private messages and full files to be turned over to Frontier

25  without searching or review.

6

1         Frontier's protocol would prohibit plaintiffs from

2    reviewing social media search term hits for relevance.   All

3    search term hits would have to be produced unless they're

4    privileged.

5         And then as I mentioned before, there is no

6    standard terms in terms of processing specifications,

7    metadata, preserving parent/child relationships, that type of

8    thing.

9         So those were the aspects I wanted to highlight.

10        THE COURT:  Go ahead.

11        MR. BAUMANN:  Sure.  Your Honor, would you prefer I

12   address the Court from the lectern or stay put?

13        THE COURT:  No, you can sit down.

14        MR. BAUMANN:  Okay.  So to view the dispute about

15   the ESI protocol in context, Your Honor, I think we have to

16   look at it in terms of the specific discovery requests and

17   what the parties have done to date.  And so from Frontier's

18   perspective, the issue is we haven't received any social

19   media to date, any e-mails to date.  We've only received the

20   EEOC files that were produced.  And so we've come back and

21   said, Okay, well, we need a protocol to say what we're going

22   to do to be able to get at those documents, because

23   plaintiffs are seeking emotional distress damages, plaintiffs

24   are seeking wide ranging damages for disputes about

25   employment discrimination generally, related to pregnancy and

1   lactation, and we want to make sure we capture all of that.

2   And so we proposed this ESI protocol to plaintiffs to be able

3   to make sure that we captured all these things.  We disagree

4   that there should be a single ESI protocol because of the

5   differences in the nature of the claims, the interests at

6   issue, the damages at issue, the burden and the cost.

7           As just a couple examples, Frontier social media

8   would not be at issue.  None of our individual employees have

9   Frontier sanctioned social media accounts.  So, for example,

10  Jerry Arellano is our main VP of HR.  He doesn't have a

11  social media that he posts on about, you know, Frontier

12  things, Frontier sanctions, that's just not very relevant

13  here.  So --

14          THE COURT:  Well, it doesn't exist.  You're not

15  saying it's not relevant?  You're saying it doesn't exist.

16          MR. BAUMANN:  Correct.

17          THE COURT:  All right.

18          MR. BAUMANN:  And so too with personal cellphones.

19  Like Jerry Arellano has a cellphone, but it's not a company

20  cellphone, it's his personal cellphone, and so Frontier has

21  no control over that.  As opposed to plaintiffs who each have

22  their individual cellphones that they would likely have

23  texted folks about pregnancy and lactation and their feelings

24  about it.  You know, things like vacations that may evoke an

25  emotional response, things of that nature that we're trying

8

1   to capture with this ESI protocol.

2           With respect to the vendor issue, we just want to

3   make sure that it's done forensically sound, that they're not

4   just screen shotting things from their Facebook or doing

5   things like that.  So if they have a vendor, that's great,

6   we're happy to make sure that everything is above board

7   there, use that vendor and go forward.  We just don't

8   understand the objection to the discovery protocol as it is

9   and we haven't received any redlines to it.  Instead we

10  received their version of the protocol.  That was entirely

11  different and we ran a comparison and everything is redlined

12  save, I believe, seven or eight words.

13          THE COURT:  Everything is redlined but seven or

14  eight words?

15          MR. BAUMANN:  Correct, Your Honor.

16          THE COURT:  Out of how many words?

17          MR. BAUMANN:  Out of 15 pages worth of ESI

18  protocol.

19          THE COURT:  Yeah.  Well, so what is it you would

20  have me do, guys?  I'm not going to write it for you, number

21  one.  Number two, Courts don't mandate this sort of thing.

22  Now, the option is to fight every discovery battle issue by

23  issue, if you don't have protocols governing the way you're

24  doing things.  Honestly that's way it has been done in the

25  past.  I would love it if you did protocols, but I didn't

1    order you to do that.  You guys put that in yourself, because

2    I never order that.

3         So one of you wrote that in, the other one agreed

4    that you'll confer and enter an ESI protocol at least four

5    weeks prior to the first deadline for production of

6    documents.

7         It just doesn't seem like, unless you just have

8    like a complete distrust in one another, which might be the

9    case, that you can't work something like this out.  I mean,

10   it's -- it's not that hard to figure out what social media

11   posting or what e-mail or what text has relevant information.

12   I mean, the search terms, you know, are subject to a little

13   bit of dispute maybe, but --

14        MS. NEEL:  Your Honor, may I?

15        THE COURT:  Yep.

16        MS. NEEL:  At this point it seems like what we

17   would like is to have a requirement that the parties enter

18   into a single ESI agreement.

19        THE COURT:  Well, I (inaudible).  If you're going

20   to do one -- okay, it's just semantics.  For him it's like,

21   you know, we need separate provisions on all these different

22   things, but that can all be contained in one big document

23   called an ESI protocol, right?  Right?

24        MR. BAUMANN:  So I would agree with that, Your

25   Honor, except that we think it's just going to be

1    administratively unfeasible to have it all together in one,

2    because then we have like one 30-page document.  Frontier's

3    proposal was, okay, let's take the common elements, we have

4    that shared between the two and then the two are separate as

5    to sources and search terms and things like that, as opposed

6    to what I think plaintiffs' proposal is to have three, one

7    common one and then two attachments to it.

8            MS. NEEL:  No, that would not be our proposal.  I

9    think the problem here, what defense counsel is saying is

10   that some of the things in the ESI protocol as proposed by

11   defendants won't apply to them, and that's fine, it just

12   won't apply to them.  If they don't have Facebook, then they

13   don't have Facebook.

14           THE COURT:  Then they're free to go ahead and put

15   that kind of sentence in there.

16           MS. NEEL:  Yes.

17           THE COURT:  Frontier doesn't believe this applies

18   to them because there are no such documents, right?

19           MS. NEEL:  Right.  So I think one simple ESI

20   protocol and then we can discuss the search terms, which is a

21   separate issue, but we can't even get to the protocol itself

22   at this point.  So I think we would like a requirement there

23   be only one single protocol and we can work together to make

24   that happen.

25           THE COURT:  That would be easiest for me.  I mean,

1    when we do a protect order, we just do one protective order.

2    Even though it covers a broad range of topics, it's just one,

3    you know, and I -- and your statement in the scheduling order

4    speaks in the singular, not the plural.  So work within that.

5    Is that fine?

6              MR. BAUMANN:  Sure.  Your Honor, let me ask this

7    for clarification.

8              THE COURT:  All right.

9              MR. BAUMANN:  So for the one single protocol, we

10   would have the common elements, like metadata and whatever,

11   and then we would have, like, say, for example, Exhibit A,

12   protocol as to plaintiffs, Exhibit B, protocol as to

13   Frontier, and they would have the separate requirements in

14   each.  So like the vendor would apply to plaintiffs, but not

15   to Frontier.  The social media to plaintiffs, but not to

16   Frontier.

17             THE COURT:  Sure, that's fine with me.

18             MS. NEEL:  Yeah, I'm not sure why it has to be two

19   exhibits attached to the --

20             THE COURT:  I don't know why it has to be an

21   exhibit either.  Why can't it be internal?

22             MR. BAUMANN:  Just to avoid ambiguity, Your Honor,

23   because if we say sources are, and then we have like

24   footnote, this doesn't apply to Frontier; footnote, this

25   doesn't apply to Frontier; footnote, this applies to

1    plaintiff, it just gets too unwieldy and less simple.  But if

2    we just say, okay, here are the common elements, Exhibit A is

3    as to this party, Exhibit B is as to this party.

4            THE COURT:  That's fine.  I mean, that's a

5    compromise, but it just needs to be an ESI protocol with --

6    like when you get to the paragraph that says plaintiffs'

7    obligation regarding social media, see Attachment A.

8    Defendant's obligation concerning whatever, personal records

9    or policies or whatever, see Exhibit B.  If you think they

10   need some kind of sort of distinct language or coverage,

11   that's fine, but it just needs to be one protocol per se.

12   Okay?

13           Does that take care of the first little part?

14           MR. BAUMANN:  Real quick, Your Honor, as to the

15   protocol itself, I know I don't want to go through each

16   individual search term, but we would like to get some kind of

17   mechanism in place to make sure that they're appropriately

18   narrowed.  So like we drew the Court's attention in our

19   submission to a policy and pilot search term and that's just

20   overbroad.

21           THE COURT:  Policy and pilot in the same --

22           MR. BAUMANN:  Right, for all of Frontier's

23   documents nationwide.  And so what Frontier --

24           THE COURT:  Well, pilot would be too broad.

25           MR. BAUMANN:  Oh, sorry, flight attendant, Your

1    Honor, sorry.

2              THE COURT:  Okay, all right.

3              MS. SEBASKI:  Your Honor, I'm sorry.  If I may,

4    when we sent our proposal to Frontier, we marked up in full

5    the search terms that they sent us with regard to -- that

6    applied to both ESI and social media and we welcomed any

7    markup from them of proposed search terms that we added.  We

8    have not received that markup, but we are happy to consider

9    changes to the search terms that we proposed that Mr. Baumann

10   is now saying are overbroad.

11             MR. BAUMANN:  And, Your Honor, just to be clear, we

12   had a conferral call about this ESI protocol last week and

13   plaintiffs refused to redline Frontier's protocol and when we

14   ran a comparison --

15             THE COURT:  Well, we're talking about search terms

16   right now.

17             MR. BAUMANN:  Right, and that's included within the

18   protocol, Your Honor.

19             MS. SEBASKI:  We did redline the search terms, Your

20   Honor.

21             MS. NEEL:  I believe Exhibit A to the ESI -- I'm

22   sorry, I'm missing the exhibits.

23             MR. BAUMANN:  Right.  And as I mentioned earlier,

24   Your Honor, so as to that we ran a comparison with Frontier's

25   protocol because Ms. Sherwin and Ms. Sebaski suggested we do

14

1    that.  And like I said, all but seven or eight of the terms

2    were changed.  I don't know if it was a formatting change

3    they did or something like that.

4              THE COURT:  That's Exhibit A called Search Terms.

5              MS. NEEL:  I'm sorry, Exhibit B to plaintiffs'

6    submission to the Court on Friday.

7              THE COURT:  Well, I'm looking at something called

8    Exhibit A Search Terms for both ESI sources and social media

9    (inaudible).

10             MS. NEEL:  Yes, Exhibit C.  The appendix to Exhibit

11   C is the redline version that plaintiffs sent back.

12             MS. SEBASKI:  Yes, and I was referring to Appendix

13   2 of that document.

14             MS. NEEL:  Yeah, Appendix 2 of Exhibit C has our

15   redlines.

16             THE COURT:  There is a lot less than -- there is a

17   lot more than eight that aren't altered at all.

18             MR. BAUMANN:  So what he did, Your Honor, is we

19   accepted all their changes in the document in this Exhibit C

20   and then we ran a comparison with Exhibit B to see what was

21   actually changed to make sure that everything that was

22   redlined was changed, because you'll see, for example,

23   metadata fields and things like that have no redlines.  And

24   so when we ran that, only seven or eight of the words were

25   preserved by the plaintiffs, for example.

15

1          THE COURT:  What does Braxton Hicks contractions

2   have to do with this case anyway?  Because you get

3   contractions when you're nursing?

4          MR. BAUMANN:  No.  Your Honor, if I may.

5          THE COURT:  Yeah.

6          MR. BAUMANN:  So I have a three-and-a-half-year-old

7   and a one-and-a-half-year-old and so my wife was going

8   through this.

9          THE COURT:  And I have 11.  I was there for

10  everyone of the pregnancies and births, so I know what

11  Braxton --

12         MR. BAUMANN:  So the Braxton Hicks were the fake

13  labor, you know, that you believe you're going into labor

14  prematurely even though you're not quite there yet.

15         THE COURT:  Right.  Well, it's not fake.  It's the

16  body pushing the child further down in the birth canal.

17  That's all it is, so.

18         MS. NEEL:  In any event, Your Honor, I believe

19  Appendix 2 to Exhibit C shows that we submitted a redline

20  version and there were many of the words there still

21  remaining.

22         THE COURT:  I see that.  I think -- I agree with

23  you.

24         MS. NEEL:  I just want to point out, we do have --

25  still have some problems with the emotional request related

1   to the social media, but the nonemotional-related search

2   terms in Appendix 2, those redlines are there and we're happy

3   to negotiate with defense counsel too.

4           THE COURT:  What is A-M-E-D-A?

5           MS. NEEL:  That --

6           MS. SHERWIN:  Your Honor, this is Galen Sherwin.

7   Ameda is a breast pump manufacturer.

8           THE COURT:  All right, Mr. Baumann, what's wrong

9   with Exhibit -- Appendix 2?

10          MR. BAUMANN:  So among other things, Your Honor,

11  Appendix 2 doesn't address any of the emotional words.  So I

12  don't know in that means that they're willing to run all of

13  the emotional words that are --

14          THE COURT:  Wait a second.  Is Appendix 2 supposed

15  to apply to searches for both your documents?

16          MS. NEEL:  I believe so, Your Honor, but I just

17  want to point out the social -- the emotional terms are the

18  ones that we still would have problems with.  So from page 14

19  on -- well, 14 and 15, but before the social media terms, I

20  believe are redlines.

21          THE COURT:  So the emotional terms are ones that

22  are proposed by Frontier?

23          MS. NEEL:  Correct.

24          THE COURT:  And what is it -- I mean, why didn't

25  you redline that?

1        MS. NEEL:  Well, we were -- we are having -- I

2   think we were at impasse in discussing the social media issue

3   and therefore thought we would wait to see how this -- this

4   turns out, but we just think that there is way more in here

5   than are -- are relevant whatsoever.  We also would argue

6   that, you know, the idea that we're going to search social

7   media for anything that's an emotional -- I can't remember

8   the language they used -- but anything that would evoke an

9   emotion, sort of like what social media is all about, so to

10  put all those search terms in there would in effect require

11  that the plaintiffs turn over their entire social media

12  account once you do a search term.

13       THE COURT:  Yeah, I'm not getting it.  So you want

14  their use of social media regarding comments concerning

15  Frontier, right?

16       MR. BAUMANN:  We want their use of social media in

17  three categories, Your Honor:  Regarding Frontier, regarding

18  their emotional state generally during the time to the extent

19  it goes to emotional distress.  So, for example, if a

20  plaintiff was very happy about going on a vacation, that

21  would cut against emotional distress during that time.  And

22  then, three, as to lactation or pregnancy and their feelings

23  about that generally.  So if a plaintiff said, you know, I

24  don't want to work past 32 weeks because I'm not feeling

25  well, that's an independent reason from pregnancy

1   discrimination that that plaintiff chose not to continue

2   working.

3            And so I guess our fallback is that we're looking

4   at the everything-about-me folder from the original

5   HoneyBaked Ham case.  And then if we come from that and say,

6   Okay, even if we're not going to produce everything, which we

7   contend would be relevant, that here are the terms that

8   should be run against it to capture the relevant pieces.

9            THE COURT:  Yeah, but, I mean --

10           MS. NEEL:  Your Honor, their request is that they

11   require -- that the search terms would relate to any event

12   that would evoke an emotional reaction, which we just think

13   is too broad and is going to include too much in their social

14   media accounts.

15           THE COURT:  Are you going after garden variety or

16   are you going after clinical?

17           MS. NEEL:  Garden variety.

18           THE COURT:  Then this just doesn't apply to garden

19   variety, I'm sorry.

20           MR. BAUMANN:  Well, Your Honor, I would agree with

21   you --

22           THE COURT:  I'm just not going let you go that

23   deep.  I mean, just because one is PO'd at Frontier and it

24   really bothers them, the fact that they had a good time on a

25   vacation is absolutely irrelevant to their claim, period.

1   And if there is a judge that disagrees with me, fine, but

2   that's too granular.  It just -- you can't try a case on that

3   basis.  It would take too much time for you to go into --

4   well, not just nine months, but if you nurse for a year, then

5   21 months of their life to see whether they had a single good

6   time, that's going way too deep, I'm sorry.  And I've dealt

7   with this issue a hundred dimes and I know it when I see it

8   and that's too far.  Now, if you want to talk about something

9   reasonable, that's fine, but that's too much.

10          MR. BAUMANN:  Sure.  So if I could address a couple

11   points, Your Honor.  First, as to the garden variety

12   emotional distress damages, this is the first we're hearing

13   of that and that's why we had asked for the damages

14   disclosures to be supplemented.  And if that's the case, that

15   may change things for Frontier.

16          THE COURT:  I think it substantially changes

17   things.  So they'll be able to get on the stand -- first of

18   all, I'm presuming by that, you're not going to put on a

19   mental health professional for anybody who says they suffered

20   depression, I had to give them meds?  That's not going to

21   happen, correct?

22          MS. NEEL:  I believe that's correct, and I will let

23   a colleague of mine correct me if I'm, but I believe you're

24   right, Your Honor.

25          THE COURT:  I mean, I just had -- I just had a jury

20

1    give $3 million with compensatory damages cap of 300,000, by

2    the way, and in closing the plaintiff's lawyer asked for 3

3    million, and I said, Why did you do that?  The statute limit

4    is $300,000.  Well, I've done that every time I've had a

5    case.  What?  I don't know.  Do you guys like that?  Is that

6    okay.

7              MS. NEEL:  I think there are reasons why you might

8    want to ask for a specific amount of money.

9              THE COURT:  Well, there is a reason you might want

10   to, but is it okay?  Can you as an attorney ask for something

11   that the law doesn't give?  That's the question.  Is that

12   ethical?

13             MS. NEEL:  I would have to give that some more

14   thought, but I can see why --

15             THE COURT:  I know, it sounds funny, doesn't it?

16             MS. NEEL:  It does.

17             THE COURT:  If it's in writing and you would ask me

18   for $3 million in writing, it would violate Rule 11.  In an

19   ADA case for compensatory damages, if a cap is 300, that

20   would violate Rule 11, wouldn't it?

21             MS. NEEL:  I would think so, yes.

22             THE COURT:  Because it's not consistent with the

23   law or any reasonable argument for extension of the law.  So

24   you get a pass because you did it orally in front of a jury?

25   Anyway, that's a story aside, but this person didn't even put

1   on evidence of emotional harm through his own testimony, let

2   alone a professional, and they gave him $3 million in an ADA

3   case.

4          So anyway, I think that, you know, there is a

5   proportionality issue here.  So you're hearing it now.

6   Certainly it's something that you can explore with them in

7   deposition, how did this affect you, and go into detail if

8   you want to.  During the time that you weren't granted any

9   kind leave or accommodation that you wanted for breast

10  feeding, how did it affect you?  And if they say it just

11  ruined my life, I will give you whatever you want; but if

12  they say, you know, it bothered me, sometimes I would lay

13  awake at night thinking about it, I was grouchy, then you

14  don't get all that stuff.  Does that make sense?

15         MS. NEEL:  I think it does, Your Honor.

16         THE COURT:  So I think it's premature to go into

17  that much detail on social media.  I think you can craft

18  reasonable searches at the moment to get anything they posted

19  or said that relates to Frontier, their experiences and even

20  their feelings based on the lack of accommodation.  So

21  anything tied directly to what they're experiencing with

22  Frontier, that's open game, no doubt there, right?

23         MS. NEEL:  I agree.

24         THE COURT:  All right.  And so do terms like that.

25  Then I will give you another shot if they testify in a way

1   that opens a bigger door than that, okay?

2           MR. BAUMANN:  Understood, Your Honor.

3           THE COURT:  All right.

4           MR. BAUMANN:  One quick point of clarification just

5   to make sure I'm on the same page.

6           THE COURT:  Sure.

7           MR. BAUMANN:  So plaintiffs also assert an FMLA

8   claim relevant to both themselves and a putative class and

9   Frontier would maintain that their activities during that

10  leave would also be relevant.

11          THE COURT:  During that what?

12          MR. BAUMANN:  That leave.

13          THE COURT:  So they say they're entitled to FMLA

14  leave.  You didn't give it to them is the allegation,

15  correct?

16          MR. BAUMANN:  Is the allegation, Your Honor.

17          THE COURT:  Yes.  And they took leave unpaid,

18  correct?

19          MR. BAUMANN:  Correct.

20          THE COURT:  All right.  And then what they did

21  during that leave -- well, if they had gainful employment, I

22  agree.  What else during that leave would be relevant?

23          MR. BAUMANN:  So plaintiffs maintain that they --

24  if Frontier had acted in a certain way, they could have come

25  back and done this, that or the other thing; but if they were

1  doing something during that time inconsistent with that, that

2  would be relevant.

3         THE COURT:  Like what?  Give me an example.  I need

4  to know what you're thinking.

5         MR. BAUMANN:  Sure.  So if they're on bedrest

6  during that time and can't do an office job even, that would

7  be relevant.  If --

8         THE COURT:  Well, yeah, but I assume that's going

9  to be part of your over discovery.  I mean, that's clear.  If

10  you're incapable of engaging in your job, that's obviously

11  relevant.  You can't get damages if you are not otherwise

12  employable during this (inaudible - siren in background).

13  Give me something more difficult to think about than that

14  one.

15         MR. BAUMANN:  Something like that if at 32 weeks

16  when they allege that they were grounded, they went on a

17  babymoon and had a preplanned babymoon or something like that

18  to Bora Bora, for example, and that's like the extreme

19  example, Your Honor.

20         THE COURT:  Right.  And?

21         MR. BAUMANN:  So Frontier's position would be,

22  well, if you were going to go on this vacation and ground

23  yourself, then Frontier wasn't the reason that you were

24  grounded.

25         THE COURT:  Right.  And so it would be relevant if

24

```
 1   it was planned and they were going to do it no matter what.
 2   If they did it only because now they have eight weeks of time
 3   that they don't know what to do with and they have four weeks
 4   until they're not able to fly because you don't really fly in
 5   your ninth month, but you can in your eighth month and your
 6   seventh month, and they're forced to be off work, what does
 7   it matter what they do with their time?
 8           Now, if they had planned it anyway, but it's going
 9   to be the dickens for you to determine whether this was an
10   inevitable vacation or it was occasioned by them being forced
11   out of work, right?  I guess it would be a credibility issue.
12   You can ask those questions certainly of them, but how
13   many -- how many class representatives are there here?
14           MS. NEEL:  Five.
15           THE COURT:  Five.
16           MS. NEEL:  Four or five, sorry.
17           THE COURT:  So, yeah, I mean, it -- or if they --
18           MS. NEEL:  Four.
19           THE COURT:  I mean, it would probably be relevant
20   that they went and got four hours of college credit too
21   during that time, and therefore, improved their circumstance.
22   That's an argument you can make to a jury.  Listen, Members
23   of the Jury, yeah, took eight weeks off, but they advanced
24   toward a bachelor's degree.  I mean, I don't know how
25   effective that argument is, but I think it's at least
```

1    discoverable.  Sure, those kinds things to some extent, but

2    not to a great extent.  Does that make sense?

3              MR. BAUMANN:  It does, Your Honor, thank you.

4              MS. SHERWIN:  Your Honor, this is Galen Sherwin.

5    If I might just jump in to correct one thing about what

6    Mr. Baumann stated regarding the plaintiffs' FMLA claims.

7    Just to be clear, the claim here under the FMLA is not that

8    plaintiffs were entitled to FMLA time that the defendant

9    didn't allow them to take.  The FMLA claim is that they were

10   assigned points, compensability points for using time, but

11   with FMLA eligible, and therefore, that's a form of unlawful

12   interference with FMLA.  So to the extent that FMLA is at

13   issue in this case directly, that is the direct claim here.

14             THE COURT:  Okay.  That makes it easier, doesn't

15   it.

16             MS. SHERWIN:  The points that Mr. Baumann was

17   making regarding what plaintiffs were actually doing during

18   the time they were on maternity leave or when they were, you

19   know, on unpaid leave otherwise because of needing to breast

20   feed, really are not relevant directly to this FMLA argument

21   that Mr. Baumann is making.

22             THE COURT:  I agree, as long as you're -- you're

23   binding your client with your representation, I agree with

24   you.  Okay?

25             All right.  So single protocol can have a couple of

1   attachments.  No for now on all the broad emotional terms,

2   but you're keeping that in reserve.  Discovery concerning

3   FMLA leave has been limited because of the scope of the

4   claim.

5          Frontier believes that plaintiffs' efforts to

6   search for responsive records has been insufficient, but you

7   don't know because they haven't produced anything?

8          MR. BAUMANN:  Correct, Your Honor.

9          THE COURT:  So how do you know what their efforts

10  have been other than the fact that you only have their --

11  what did say? -- personnel files or something?

12         MR. BAUMANN:  The EEOC files.

13         THE COURT:  EEOC files.  How do you know -- do you

14  know in detail what their search efforts have been except

15  based on what you've received so far?

16         MR. BAUMANN:  No, and that's the issue, Your Honor.

17  And also add to that, that we tried to elucidate that during

18  phone calls with them and asked them, like, what search terms

19  have been run, like, what did plaintiff Melissa Hodgkins do

20  to respond.  They wouldn't let us know.  Their response was

21  (inaudible - papers shuffling).  So we don't know what's been

22  collected or what it is or anything.

23         THE COURT:  All right.  So when will you be

24  producing your first real big document production?

25         MS. NEEL:  We have, Your Honor.  We produced every

1    12,000 pages of documents in the flight attendant's case.

2              THE COURT:  Not just the EEOC?

3              MS. NEEL:  Well, the EEOC file is a file from a

4    case that went on for several years and involved significant

5    discovery, and so we -- in the course of our earlier

6    investigation and going through the EEOC process, we have

7    obtained from our clients significant numbers of documents,

8    e-mails, policies, all sorts of things that have already been

9    produced to the defendant.

10             The next round we have -- in the course of

11   preparing for the next round of disclosures, we have hired a

12   discovery vendor who has -- who has all four of our -- I'm

13   sorry, there are four clients, names plaintiffs in the

14   case -- all four of named plaintiffs' e-mails, which are in

15   their possession.  We've done individual interviews with each

16   of our clients to find out what -- you know, what documents

17   and information they have.  The social media accounts have

18   been downloaded.  So this is all in the possession of the

19   discovery vendor and will be able to be disclosed once we get

20   the ESI protocol going, but there has been a significant

21   amount of discovery -- or documents produced already.

22             THE COURT:  Okay.  So that seems a little

23   premature.  I think, you know, you do get many bites at the

24   apple in this discovery context, which is not beneficial to

25   me, but it is what it is.  So why don't you get that protocol

28

1    entered, produce your next wave and then the more specific

2    you can be about inadequacies the better off we all are.  And

3    what I generally expect is that, Your Honor, we know there

4    are documents responsive to this case because here is a

5    couple that we've seen, but logically there ought to be

6    hundreds more of this type of document and they're just not

7    there and so we're concerned that that search hasn't been

8    done.  That's -- that's the argument that carries some

9    weight, okay.

10          The next thing I have is a temporal scope.

11   Plaintiffs want confirmation that January 1, 2013 to December

12   31, 2020 is the applicable time period.  What is the claims

13   period?

14          MS. NEEL:  I don't remember.

15          THE COURT:  Is it six years?  Four years?  Three

16   years?

17          MS. NEEL:  I'm -- because it was in the EEOC for so

18   long, Your Honor, I'm having a hard time -- Ms. Sherwin, do

19   you have that answer?

20          THE COURT:  Galen?

21          MS. SHERWIN:  I'm sorry.  So the question is what

22   is the claims period?

23          THE COURT:  Correct, covered in the lawsuit.

24          MS. SHERWIN:  So the period in question goes back

25   to 2013, Your Honor.

1          THE COURT:  Okay.  All right.  So what's the issue,

2   Mr. Baumann?  Do you have an issue with the time period?

3          MR. BAUMANN:  So the claims period is January 1,

4   2015 through October 6, 2017, because it's 300 days prior to

5   the first charge, but I don't think we have an issue because

6   I believe Frontier already agreed to the 2013 to 2020 as a

7   compromise, so --

8          THE COURT:  Okay.  Are we good on that?

9          MS. NEEL:  We are, Your Honor.

10         THE COURT:  All right.  Now, do we need to dive

11   into specific responses?  Like I have a list of four for each

12   of you.  I don't know if it's accurate.

13         MS. NEEL:  Yeah.  Well, I mean, another issue that

14   --

15         THE COURT:  Like comparator information.

16         MS. NEEL:  Yes.  Comparator information, medical

17   records, tax returns are the issues that I have.

18         THE COURT:  Whose medical records?

19         MS. NEEL:  Our clients.  It's not my -- it's an

20   issue that defendant is seeking all medical records of any

21   sort of any kind.  And I think this is where the issue came

22   from and went back to 2011 was the request, which was one of

23   the problems.

24         THE COURT:  So what is the -- if a woman had breast

25   cancer back in 2011, what difference does it make as to

1    whether she should be able to nurse in 2015?

2         MR. BAUMANN:  So the request itself, Your Honor,

3    said for each named plaintiff a year before her first

4    pregnancy to a year after she stopped breast feeding her last

5    child to make sure we capture full period of childbearing and

6    lactation.  What we're looking for is any of the emotional

7    stress stuff, the stuff related to stressors, but also

8    medical conditions related to the ability to carry the

9    pregnancy to term and any medical limitations on that outside

10   of the normal, quote/unquote, pregnancy and decisions about

11   lactation.  So --

12        THE COURT:  Go backwards a second.  We've already

13   dealt with a little bit on the emotion.  Now, I agree if

14   there are readily available medical records that actually

15   address directly their emotional state, but I'm just not sure

16   how much an intake note that says Carolyn presents today with

17   whatever, you know, urinary tract infection, her mood is good

18   or her affect is fine, blah, blah, blah, blah, blah.  Does

19   that make a difference?

20        MR. BAUMANN:  So yes and no, Your Honor.  No in the

21   sense that if all along the medical records have said, Oh,

22   her affect is good, but if she said the week prior, Oh, you

23   know, I'm very depressed or I'm very stressed about this or,

24   you know, whatever the case maybe, and then a week later says

25   her affect is good, I think that would be relevant.  Or the

1    absence of the complaint could be relevant, but that's as to

2    the emotional distress.

3            Then if we look as to the medical conditions

4    themselves, I personally do not know how a urinary tract

5    infection could affect pregnancy and if there is any issue as

6    to that.

7            THE COURT:  Well, why does something affecting the

8    pregnancy make a difference?  We're talking about -- okay,

9    wait a second.  We're talking -- is part of your claim that

10   they had to leave at 32 weeks?

11           MS. NEEL:  That -- well, so this -- this is for the

12   flight attendants and -- the claim is about the ability

13   there -- like the medical -- their ability to fly during

14   pregnancy.

15           THE COURT:  Right.

16           MS. NEEL:  So we've agreed to provide medical

17   records relating to breast feeding, pregnancy,

18   pregnancy-related conditions, morning sickness, lower back

19   pain.

20           THE COURT:  Or any condition also that would

21   prevent them from flying?

22           MS. NEEL:  Yes, the -- that could be an appropriate

23   limitation, Your Honor; however, that wasn't a limitation in

24   the request.  The request is --

25           THE COURT:  But it's a logical one, don't you

1    agree?

2           MS. NEEL:  I agree, that could be a logical

3    limitation to this request.  But the request is, all medical

4    records, mental health records, every medical care provider

5    for the time period that Mr. Baumann corrected me on, and we

6    think that is too broad.

7           THE COURT:  I mean, for example, if you have

8    Crohn's or something like that, that could impact your

9    ability to travel, right?

10          MS. NEEL:  To fly?

11          THE COURT:  Yeah.

12          MS. NEEL:  I don't know about that, but sure.

13          THE COURT:  I promise you it does.

14          MS. NEEL:  Okay, yes, just not familiar with it;

15   but, yes, there could be something that would impact their

16   ability to fly other than pregnancy and that could be an

17   appropriate limitation.

18          THE COURT:  Don't you agree?

19          MR. BAUMANN:  I would agree with that, Your Honor.

20          THE COURT:  Okay.

21          MR. BAUMANN:  And also things as to like if it is a

22   high-risk pregnancy for any given reasonable.  So there are

23   any number of medical conditions that can create a high-risk

24   pregnancy as well that a doctor would say, Okay, well, we

25   need you to be grounded.

33

1           THE COURT:  But that would be encompassed within

2     the ability to travel, because if you have a high-risk

3     pregnancy --

4           MS. NEEL:  That would be in their records related

5     to their pregnancy.

6           THE COURT:  Right.

7           MS. NEEL:  Or their OB/GYN or their doula or --

8           THE COURT:  And you're not objecting to records

9     relating to pregnancy?

10          MS. NEEL:  Not at all.

11          THE COURT:  All right, there you go.

12          MR. BAUMANN:  Well, and, Your Honor, I just want to

13    clarify, that should also include their PCP and any other

14    individual they saw, not just their OB/GYN?

15          THE COURT:  If it relates to pregnancy, yes.

16          MR. BAUMANN:  And lactation as well?

17          THE COURT:  And lactation as well, yeah.

18          MS. NEEL:  I mean, you're not generally going to

19    see your PCP for pregnancy-related issues or lactation.

20          MR. BAUMANN:  But if you go to your PCP to get a

21    flu shot, then --

22          THE COURT:  But it doesn't matter whether you

23    generally are or not.  If the request -- if the concession is

24    records relating to pregnancy or lactation, it doesn't matter

25    what the source is.

1          MS. NEEL:  Correct.

2          THE COURT:  If it's a doula, if it's a midwife.

3          MS. NEEL:  Yeah, we've agreed to lactation

4   specialists, doulas, OB/GYNs, and we have sought records

5   related to pregnancy from each of our --

6          THE COURT:  There you go.

7          MS. NEEL:  And those are underway.

8          THE COURT:  I mean, most women can tell you who had

9   any hand in their pregnancy.  I just think that would be the

10  case, because it's a very memorable time in their life,

11  right?

12         MS. NEEL:  Yes, it is.

13         THE COURT:  So it shouldn't be much of a mystery.

14  And we've got social media, we've got medical.

15         MR. BAUMANN:  Sorry, Your Honor.  Real quick on the

16  medical.

17         THE COURT:  Yes.

18         MR. BAUMANN:  So I think it is more broad than just

19  pregnancy and lactation.  As Your Honor noted, it's also

20  ability to fly and ability to perform --

21         THE COURT:  We already said that, yeah, I agree.

22  And that can't be reasonably disputed in my mind, because if

23  you don't have an ability to fly -- you know, like if you

24  have an inner ear infection, all right, and flying would

25  cause your eardrum to burst, you might be grounded for a

1   while, right?

2           MS. NEEL:  Yes, possibly.

3           THE COURT:  Because I've had that, it's a real

4   bummer.

5           MS. NEEL:  So medical records related to pregnancy

6   or ability to fly?

7           THE COURT:  Correct, or pregnancy or lactation and

8   ability to fly.  All right.

9           MR. BAUMANN:  And, Your Honor, just so we're clear,

10  ability to lactation would also be -- like ability to breast

11  feed would also be within that?

12          MS. NEEL:  Yeah, of course, lactation is that,

13  yeah.  I mean, some women develop painful part of their body

14  that at least interferes with the ability to nurse and

15  sometimes they've got to stop.

16          MR. BAUMANN:  Sure.  Or my understanding is that

17  some women take medication that prevents them from breast

18  feeding because it can pass through the breast milk or things

19  like that.

20          THE COURT:  Well, also some -- I'm dealing with an

21  issue right now with daughters-in-law that the baby is

22  allergic to certain foods and so the mom can't eat these

23  foods and, well, those foods are pretty essential to life so

24  maybe you have to go on formula, I don't know.  But these are

25  all logical.  It's not --

1           MS. NEEL:  Yes, Your Honor, we have not opposed

2    those types of requests.

3           THE COURT:  Okay, very good.  Well, you know what

4    my feeling is on that, so all right.

5           MR. BAUMANN:  Your Honor, I'm sorry, before we

6    leave that.  So logistically --

7           THE COURT:  Last time.

8           MR. BAUMANN:  I know, Your Honor.  So logistically

9    we have proposed having them sign releases to release the

10   medical records and they would be subject to a protective

11   order.  We want to make sure everything is captured.  So even

12   if Frontier doesn't get the releases, we would propose that

13   the releases get signed, they go to the medical providers,

14   and if there is a dispute about what should be provided, then

15   they get provided to the Court in camera, like I believe one

16   of the cases that the plaintiffs cited were, just to make

17   sure we have the whole universe first as opposed --

18          THE COURT:  I always impose that dumb requirement

19   on myself and I have done in the past.  It just takes the

20   burden off of you guys.  I want it as little as possible.

21          MS. NEEL:  Your Honor, we've already requested

22   these records from our clients medical providers.  We can

23   produce those if there is an issue after that.

24          THE COURT:  Through a release?

25          MS. NEEL:  Through a release, yes.  Yes, we have

1   releases signed and provided to the medical care providers

2   for our clients and those records will be coming and turned

3   over.

4           THE COURT:  Okay.

5           MR. BAUMANN:  And I would just add, can we get a

6   copy of the release to see what was requested?

7           THE COURT:  Yeah, of course.  I mean, if it's just

8   a simple release, just copy the releases.  Now, it's not

9   unheard of that you're taking a deposition of somebody and

10  she thinks of somebody else she saw and didn't tell her own

11  attorneys of that.  That's pretty frequent.  So if that

12  happens, you just have to follow up on that, okay?

13          MR. BAUMANN:  True.

14          THE COURT:  And if it's egregious enough, no fault

15  on anybody, but if it really would be material and you want

16  to question them on that, then you get a supplemental depo,

17  okay?

18          All right.  So request for income and potential

19  failure to mitigate.  I mean, mitigation obviously is always

20  a material issue.  Income -- I mean, I guess if a plaintiff

21  says -- if a plaintiff intends to come into court and say,

22  Because of this thing Frontier did, we had to give up this,

23  we had to give up that, we lost this, I couldn't do this,

24  then their income is relevant, right --

25          MS. NEEL:  Uh-huh.

1          THE COURT:  -- from other sources?  Agreed?

2          MS. NEEL:  Yes, we believe that's true and --

3          THE COURT:  Because that goes to credibility of a

4    witness and that's always an issue in any case.

5          MS. NEEL:  Yes.

6          THE COURT:  All right.  So -- and then again

7    potential failure to mitigate.  Not sure what that means.

8    We're talking about people who weren't terminated, right?

9          MS. NEEL:  Correct, they all still work there, Your

10   Honor, which -- so part of the information that the defendant

11   is requesting is in their possession, right.  I mean,

12   Frontier knows the income that they have provided to each of

13   our plaintiffs.  We have agreed to provide W-2s and 1099s if

14   they exist for the -- for our plaintiffs, the named

15   plaintiffs as well, which would provide income -- defendant

16   have requested tax returns and all schedules and everything

17   related to tax returns, which we think is --

18         THE COURT:  It's pretty common, but are you going

19   to take the position that if they had to leave at 32 weeks

20   they should have gotten a different job until they're back at

21   Frontier?

22         MR. BAUMANN:  No, Your Honor.  We're curious if

23   they did do anything --

24         THE COURT:  So you won't take that position?

25         MR. BAUMANN:  No.  We're looking for income-wise.

1    We're looking at the W-2s and stuff they got from earned

2    income --

3                THE COURT:  Sure.

4                MR. BAUMANN:  -- but also passive income.  Like if

5    one of them suddenly started renting out the room in their

6    basement or rented out a rental property or something like

7    that to pay, quote/unquote, for the leave, we think that

8    would be relevant.

9                THE COURT:  You mean if they did it just because of

10   that?

11               MR. BAUMANN:  Correct.

12               THE COURT:  And they wouldn't have otherwise have

13   done it?

14               MR. BAUMANN:  Correct.

15               THE COURT:  I'm not so sure.  I don't know.  That's

16   a legal argument.

17               MS. NEEL:  Well, they also haven't asked the

18   question of our plaintiffs, Your Honor.  The request was only

19   for documents.  There was not an interrogatory directed at

20   this to ask if they had other sources of income in order to

21   determine whether it was necessary.

22               THE COURT:  Well, that would be an appropriate

23   interrogatory, yeah, I mean, to be -- that they were

24   available for eight weeks or ten weeks or 12 weeks, and so a

25   couple of their best friends say, Hey, could you watch our

1   kids for this time and they became a nanny and earned income

2   that way, where they wouldn't have earned income had they

3   been flying.  Yeah, that kind of stuff is again potentially

4   in a zone, it's just sort of at the margins where you guys

5   should be having your battles, but not in the essence of it,

6   right?

7         MS. NEEL:  Right, and we would be happy to turn

8   over the sources of income and answer the question.  We just

9   don't want to turn over tax returns.  We just don't think

10  it's necessary at this time if we provide W-2s and 1099s and

11  happily answer questions related to income.

12        THE COURT:  I understand, but you know why tax

13  returns are the best source, because if you lie, you're

14  committing perjury, and so we all trust tax returns.

15        MS. NEEL:  Well, there is no evidence in this case

16  that our clients have that sort of credibility issue.

17        THE COURT:  No, no, no, I know.  I'm just telling

18  you from a defense standpoint that's why they like those

19  best, because they believe, when push comes to shove, people

20  will be honest with the IRS.

21        But I mean, try to get what you can absent a tax

22  return, but if you think there is missing -- there is gaps,

23  it is within the authority, the discretion of the Court to

24  order that to be produced pursuant to protective order, which

25  I assume you guys have.

41

1          MS. NEEL:  We do.

2          THE COURT:  So -- and it can be Attorneys' Eyes

3     Only, okay.  Sometimes -- yeah, all right.

4          And then damages calculation, I mean, you're

5     ultimately entitled to do that.  I like it in a -- in the

6     initial disclosures because that's what the law requires.  It

7     also requires it in a scheduling order and it requires all

8     the way along.  I mean, I'm not fond of plaintiffs' counsels

9     deliberate indifference to focusing on damages because a

10    defendant is entitled to know what they're being asked to

11    pay, and so as any insurance company that's going to pay any

12    judgment, they have an obligation actually to their

13    shareholders to put reserves in for a claim, and a million

14    dollar claim is a lot different than a $5 million claim, so

15    that's just the law.

16         So what have you done in damages calculations?

17         MS. NEEL:  We have not yet provided sort of an

18    actual calculation of the amount.  We have agreed during our

19    conferral process to provide an initial estimate of backpay

20    for each named plaintiff at this time.  We think we could do

21    that.  We are missing some information that would be valuable

22    in making this determination, which defense -- the defendant

23    has refused to provide, which is sort of a document showing

24    what benefits are worth at Frontier for our clients.  So if

25    we know what the value of the benefits are, we can provide a

1    more accurate calculation.

2              THE COURT:  Well, if they don't do that, all you

3    have to do is say plus --

4              MS. NEEL:  Plus benefits.

5              THE COURT:  -- benefits adjustment based on

6    whatever Frontier's values benefits?

7              MS. NEEL:  Sure, and we can do that, Your Honor.

8    We've agreed to provide the backpay calculation.  We don't

9    think that any evaluation of emotional distress on a monetary

10   terms is ripe at this point.

11             THE COURT:  I agree.

12             MS. NEEL:  Okay.

13             THE COURT:  I mean, yes.  In fact, it's -- it's not

14   subject to reduction to numbers, but I think you can safely

15   assume each one is going to ask for $300,000.  Is that fair?

16             MS. NEEL:  I don't know the answer to that, Your

17   Honor.

18             THE COURT:  Don't ask for 3 million, though, not in

19   front me.

20             MS. NEEL:  Not in this Court.

21             THE COURT:  And she said no judge had ever even

22   mentioned this to her out of 25 times she's done it in front

23   of a jury.  Nobody else had ever said, Why did you do that?

24   I don't know.  I guess it depends on who you run that by.

25   Some people say, No problem, and other people say, What?

1          Okay.  So do we need to go to the plaintiffs'

2    request, then?

3          MS. NEEL:  I believe we do, Your Honor.  I think

4    that covers --

5          MR. BAUMANN:  I would like to --

6          THE COURT:  Go ahead.

7          MR. BAUMANN:  On the damages issue.  So plaintiffs

8    offered to provide the backpay calculations and our response

9    was, Okay, if they're only seeking backpay, then that makes

10   sense to us you.

11         THE COURT:  I agree.  Are there any other economic

12   damages that you think that are potential for trial?  I can't

13   imagine, but --

14         MS. NEEL:  I can't think of any sitting right here,

15   but we will take the advice that if there are, we should

16   produce that as well.

17         THE COURT:  Okay.  So typically it's backpay.

18         MS. NEEL:  Uh-huh.

19         THE COURT:  Compensatory damages, attorneys' fees.

20         MS. NEEL:  Right.

21         THE COURT:  That's a lot of money right there,

22   so --

23         MS. NEEL:  Right.  And compensatory would include

24   emotional distress, but we are not going to be calculating

25   that.

1          THE COURT:  Pain and suffering, no.  Inconvenience,

2     everything.  All the stuff that can't be reduced to a number,

3     that's what that is providing.

4          MS. NEEL:  I can't think of other compensatory

5     damages right now, but I might be forgetting something.

6          THE COURT:  You mean economic?

7          MS. NEEL:  Yes, I'm sorry.

8          THE COURT:  Okay.  So they have an obligation to

9     produce to you any supplement regarding economic at the

10    moment.  I think their good faith representation is beyond

11    backpay there is nothing, okay.

12         MR. BAUMANN:  And with respect to the emotional

13    distress damages, I agree with the Court and the plaintiffs

14    that we can't necessarily estimate, but to the extent they're

15    saying we're limiting it to garden variety, we need to

16    understand what garden variety looks like to them, because I

17    don't have the case law in front of me, of course, but my

18    understanding is that garden variety, quote/unquote, can very

19    widely, so we just need a range of what they're looking for.

20         THE COURT:  Yeah, it matters more for settlement

21    than for trial, because at trial there is no cap just because

22    you're not bringing in a social worker or a psychiatrist or

23    psychologist, right?

24         MR. BAUMANN:  True.  Yeah, I guess we're looking at

25    exactly that.  What will they ask the jury to provide in an

1   emotional distress damages because nobody stands up in front

2   of a jury and says, We're looking for garden variety

3   emotional distress.

4          THE COURT:  No.  But, I mean, I just don't -- I

5   think that -- I'm not sure I've ever seen a Court require

6   that, have you?

7          MR. BAUMANN:  I don't know off the top, Your Honor.

8   Like I said, I know there are cases about what garden variety

9   means for emotional distress, like what range that is,

10  between 30 and 300.

11         THE COURT:  Yeah, I think it's such an intimately

12  personal thing that, you know, I just -- you're smart people,

13  you've handled employment cases your entire life, I assume,

14  so has your firm.  You know what compensatory damages are, so

15  it would just be I think an unrealistic exercise to have

16  (inaudible - papers shuffling) anything, but I guarantee you

17  they're not going to waive any right to seek less than the

18  law permits, right?

19         MS. NEEL:  Correct.

20         THE COURT:  So there you go.  Whatever the law

21  permits in terms of that I think you're just going to have to

22  live with it.

23         MR. BAUMANN:  Sure.

24         THE COURT:  All right.

25         MR. BAUMANN:  And so I guess for purposes of our

1     understanding going forward, garden variety can mean up to

2     the 300,000?

3              THE COURT:  No.  Garden variety doesn't deal with

4     amount.  It deals with the scope of discovery.  So when we

5     throw out the terms "garden variety," it means they're not

6     going to bring in a medical care professional who diagnosed

7     them, who provide them meds.  Garden variety simply means I

8     suffered, I will dealt with it myself.  Agreed?

9              MS. NEEL:  Yes, I agree with that, Your Honor.

10              THE COURT:  Okay.  It comes up mostly in

11     settlement, but I don't think it's -- it is a colloquial term

12     that's not used in any kind of statute, so it just puts you

13     on fair notice that you don't have to go out and hire a

14     psychiatrist yourself or do an IPE.  That's my view of it.

15     Do you think -- am I wrong?

16              MS. NEEL:  I don't think that's wrong, Your Honor.

17     I agree with that and I also -- you know, whether or not one

18     of our clients may have at some point mentioned to her doctor

19     that she wasn't feeling or if something doesn't turn this

20     into a case where it's a issue of clinical, you know, medical

21     depression or not --

22              THE COURT:  Right, but too much of that would?

23              MS. NEEL:  Right.  And that would be something I

24     think in, you know, discovery -- like you said, if you got

25     through discovery through depositions and there was a lot of

1    testimony about that, that would open the door to something

2    that --

3              THE COURT:  Everything we say is contingent on the

4    state of knowledge as we know it now.  If that state of

5    knowledge alters, then you've got a good cause for coming

6    back and asking for additional relief.  When is the discovery

7    period?

8              MS. NEEL:  I think August or September.

9              THE COURT:  You guys have got to be --

10             MS. NEEL:  I'm sorry?

11             THE COURT:  You've got to be pushing it because

12    that's going to creep up on you really fast.

13             MS. NEEL:  Yeah, I understand.

14             THE COURT:  Okay.  All right.  Are you good?  No

15    more one more things?

16             MR. BAUMANN:  I believe so, Your Honor.

17             THE COURT:  All right, good.  So comparator

18    information.  You mean comparator potential plaintiffs or

19    what are you talking about?

20             MS. NEEL:  Your Honor, I'm doing to allow

21    Ms. Sherwin to handle this specific issue.  She's much closer

22    to that.  Thank you.

23             THE COURT:  Sure.

24             MS. SHERWIN:  Thank you, Your Honor, thank you.  So

25    the defendant is seeking improperly to limit some comparator

48

1    information only to those who requested accommodations.  And

2    when I say comparator information, what I mean is that in

3    order to prove their claims as well as for purposes of class

4    certification, they need to show that they were treated worse

5    than others who are similar in their ability or inability to

6    work and for disparate impact purposes that they are treated

7    worse overall than the rest of the employees at Frontier.

8           On the disparate impact claim for purposes of class

9    certification specifically, we have to show significant proof

10   of disparate impact in order to demonstrate commonality under

11   Dukes (ph) vs. Walmart.  So we need to show that the

12   disciplinary trade practice had a common harmful affect

13   across the class and that the class members were harmed to

14   disproportionally compared to employees outside of the

15   protective group.  And that's a protected group as a whole,

16   not just others who sought accommodations.

17          So defendants are essentially seeking to, you know,

18   define the comparator class to be much, much narrower than

19   what is required and relevant for discovery purposes, and

20   that's, you know, inappropriate -- it's inappropriate for the

21   defendants to be limiting the discovery in that way.

22          THE COURT:  Well, give me an example, please.

23          MS. SHERWIN:  An example of what, Your Honor?

24          THE COURT:  Of who they say is not a relevant

25   comparator and you say is.

1          MS. SHERWIN:  So they are saying the only relevant

2     comparators are other employees who sought accommodations,

3     and that's true with respect to a number of their requests --

4     our requests, I'm sorry.  We are saying we need -- yes, we

5     need information about others who sought accommodations,

6     primarily for purposes of the dispersed treatment claim, but

7     for purposes of disparate impact claim, we have to show the

8     impact of -- the harmful impact on the group as a whole on

9     pregnant or breast feeding flight attendants as compared to

10     others as a whole, not just others who sought accommodations.

11          THE COURT:  I'm not understanding.  So give me an

12     example of a person who might fall into this comparator

13     status.

14          MS. SHERWIN:  So if I'm understanding your

15     question, Your Honor, a person who -- so it's more a group

16     aggregate analysis than any other individual.  The question

17     is to prove disparate impact in particular, and for class

18     purposes, for purposes of showing commonality, we have to

19     make an aggregate showing that women or people affected by

20     breast feeding and pregnancy are affected or harmed relative

21     to everyone else.

22          So an example would be if they're earning lower,

23     annual earnings are lower, or if they suffered discipline a

24     higher rate.  Or for purposes of, for example, the

25     dependability policy that is at issue in this case.  They

1  need to show that they are -- that they would receive points,

2  more points during pregnancy than others who were not

3  pregnant.  And it's not just others who asked for

4  accommodations, because accommodations are not directly at

5  issue in the FMLA claims, for example, or the claims related

6  to the dependability policy.  It's the assess, we are

7  measuring the harmful effects of the policies that are

8  challenged on people affected by the pregnancy and breast

9  feeding as compared to people who are not pregnant or breast

10  feeding, so that's everyone.  And that does require assess

11  the companywide data on employees, not just employees who

12  requested accommodations.

13          So essentially what defendants are attempting to do

14  is to convert all of plaintiffs claims into disparate

15  treatment claims, but plaintiffs have disparate treatment

16  claims, disparate impact claims, and they need to show

17  commonality for purposes of the class certification.

18          And what defendants are doing would essentially

19  deprive plaintiffs from information that they would need in

20  order to make those showing.

21          THE COURT:  So --

22          MS. SHERWIN:  And just to clarify -- not asking for

23  all employees.  We are just asking for flight attendants.

24          THE COURT:  So you want to put on the average

25  salary of a flight attendant on one slide and then the

1    average salary of a flight attendant who was pregnant at some

2    point while with Frontier on another slide?

3           MS. SHERWIN:  Essentially that's right, Your Honor,

4    and there are different ways that you can show harmful

5    effect.  Like not just salary, you know, accrual of

6    dependability points, rates of departure, voluntary or

7    otherwise from the company, things of that nature.  And we

8    have -- you know, Courts have afforded plaintiffs in these

9    types of cases of (inaudible) in determining how to show

10   those harmed.

11          We will need to provide that data in order for our

12   expert, and there will be expert testimony at issue for

13   purposes of class certification as well as for other reasons

14   in this case.  Our expert will need to be able to review that

15   companywide data on flight attendants, and there is no basis

16   to limit it only to flight attendants who sought

17   accommodation because that's obviously going to be a much

18   smaller pool, but, you know, essentially irrelevant to the

19   analysis that needs to be conducted in order to show

20   commonality and in order to essentially prove up the

21   disparate impact claim.

22          MR. BAUMANN:  I think on behalf of Frontier we had

23   the same question you had, Your Honor, about who the --

24          THE COURT:  Well, no, I changed my opinion.  I

25   mean, if all flight attendants as a whole made $72,000 a

52

1    year -- she's going beyond wage and that's fine, I'll get to

2    that -- and as a class the people we're talking about who got

3    pregnant and lactated and breast fed got paid an average of

4    $68,000 a year, or 55-, that's evidence that there was a

5    disparate impact on that class of people as compared to all

6    flight attendants.  Agreed?

7          MR. BAUMANN:  I'm not sure I totally agree, Your

8    Honor, for a couple of reasons.  One, because plaintiffs have

9    represented that they're not picking and choosing the

10   individual.  It's 100 percent of folks, but I think also it

11   doesn't go to everyone nationwide that's ever been a flight

12   attendant for seven years.  I think that's way too overbroad.

13   Like if we were going to say, okay, the universe of people

14   we're looking at is those based in Denver, based out of

15   Denver, we're going look at those folks or some principled

16   way of looking at it, I think I would agree with you, Your

17   Honor.  And that's what Frontier tried to do.  We said, Okay,

18   we'll give you everybody who sought an accommodation of any

19   kind, whether it's somebody who is like --

20         THE COURT:  Well, wait, were all these -- all your

21   plaintiffs Denver based?

22         MS. NEEL:  For the flight attendants?  I believe

23   that -- oh, I can't remember, I'm sorry.  I get the flight

24   attendants and the pilots mixed up.  Galen, are all of our

25   flight attendants based in Denver?

1          MS. SHERWIN:  I believe so, but I would need to

2    confirm that.  I'm sorry, I don't have that in my head.  But

3    if I can just respond to one point, Your Honor, regarding the

4    limitation that Mr. Baumann is proposing.  Any statistician

5    will tell you that a smaller data set will get you less sound

6    results, and, you know, that is the reason that we've asked

7    for the breadth of data that we are seeking here.

8          And in order to have, you know, to show results of

9    statistical significance and, you know, sound -- as a matter

10   sound statistical analysis, we need access to all the data,

11   and there is no basis to limit it based on the law to people

12   based in Denver.  We are seeking to represent a nationwide

13   class here, not just a class of individuals based in Denver,

14   Colorado.  And there is no basis to limit it to graphically

15   even without that stat.  For purpose -- even if this were

16   being prosecuted as an individual case -- in other words,

17   rather than a class action -- there is no principled reason

18   to limit it to Denver.

19          THE COURT:  Yeah, I don't know that.  I mean,

20   typical comparator information relies on chain of

21   supervision, for example.  Are they in a different chain of

22   supervision?  Are they in a different section?  Are they in a

23   different department?  Are they in a different state?  Those

24   things did I ever from situation to situation, almost always.

25   And so a true comparator needs to be a relevant comparator in

54

1   all material aspects.

2           MS. SHERWIN:  Your Honor, with respect to policies

3   that, for example, vary district by district or region by

4   region, but here we're talking about a centralized policy

5   that applies equally to all flight attendants nationwide.

6   There is no difference, and it's all handled through one HR.

7   So that's our allegation.  If that proves not to be true in

8   discovery, and certainly that's something that defendants

9   are -- you know, defendant is free to argue in response to

10  the motion for class certification -- you know, that's

11  something that could be taken into account, but that's not

12  the case here.

13          The case here is that all policy -- is one single

14  policy that's at issue, with respect to each of the

15  policies -- in other words, it does not vary by region.  It

16  is not nationwide and it is all handled through central

17  headquarters.  So all of the flight attendants, no matter

18  where they are based, are similarly situated for that

19  purpose.

20          THE COURT:  Let me ask you this:  Do you have a

21  feel for human flight attendants based in Denver are compared

22  to flight attendants everywhere, like one-fifth, one-third,

23  one-tenth?

24          MR. BAUMANN:  I don't know off the top of my head,

25  Your Honor.  I would have to guess.

1          THE COURT:  Guess.

2          MR. BAUMANN:  I honestly can't even give a reasoned

3    guess.

4          THE COURT:  How many hubs are there for Frontier.

5          MR. BAUMANN:  I don't know off the top, Your Honor,

6    I apologize.  I guess to Ms. Sherwin's point, or part of it,

7    these are all unionized employees subject to a collective

8    bargaining agreement, that there was a nation one, but I

9    believe there may also be local ones, and I don't know that

10   for sure off the top, but like the average salary that you

11   talked about would be governed by the CBA and so we've

12   provided that.

13         THE COURT:  Do you know that?

14         MS. NEEL:  The average salary of --

15         THE COURT:  No.  Whether there were different

16   bargaining units based on geographic location?

17         MS. NEEL:  I don't know, but Ms. Sherwin --

18         MS. SHERWIN:  Your Honor, I'm not aware of

19   different -- I don't know whether there are different

20   bargaining units.  I know there is only one CBA that applies

21   to the flight attendants and -- to all the flight attendants

22   nationwide.

23         THE COURT:  But many companies in the United States

24   government have compensation structures that differ according

25   to geography because of the cost of living.  It's just

1  different in Memphis, Tennessee than it is in Denver,

2  Colorado or San Francisco, California, and you know, you've

3  got to accommodate for that.  It gets very complicated.

4  So -- and expensive, I assume.

5        MR. BAUMANN:  To add to that, Your Honor, so the

6  way the CBA determines compensation is not a salary based on

7  seniority or something like that.  It's based on hours and a

8  guarantee.  And so Frontier looked at that and said, Okay,

9  can we determine how many hours any given flight attendant

10  has worked or would work under the guarantee and stuff like

11  that, and that they can't.  Like the CBA is what it is, and

12  if we drill down and look at individual's people individual

13  compensation we can do that.  And that's why we offered to do

14  the individuals who had sought accommodation as a cheat sheet

15  kind of thing.

16        THE COURT:  Well, what about nationwide individuals

17  who have sought accommodation in Denver for all flight

18  attendants?  I have a good feel for statistics, Ms. Sherwin,

19  and, of course, the larger the sample marginally may be

20  better the outcome as far as some kind of certainty, but

21  maybe only slightly.  If you have a large enough sample of

22  people, you're going to come to a correct statistical

23  conclusion.

24        MS. SHERWIN:  Your Honor, I don't know how to that

25  because Mr. Baumann is unable to and we have no basis for

1   knowing what the difference is in size between Denver and

2   nationwide, so, you know, it's impossible for us to answer

3   the question here without that information.

4           I think that, you know, the types of differences

5   are different reasons that Mr. Baumann is referencing are all

6   things that an expert can take into account in running their

7   analyses.  And so, you know, again, there is no basis to

8   limit the -- certainly not people who have sought

9   accommodations, because again that's just not the appropriate

10   comparator group for anybody, for any of the claims with

11   perhaps the exception of the pure disparate treatment failure

12   to accommodate claims, and that's just a slight of the claims

13   that are being brought in this case.

14           THE COURT:  Okay.

15           MS. SHERWIN:  So it would really hamstring the

16   plaintiffs right out of the gate in giving the analysis

17   that's necessary in order to prove their claims.

18           THE COURT:  Well, I don't know if there is enough

19   information, so I need for you to find out from your client

20   the rough percentage of flight attendants that are based in

21   Denver out of their whole system.  Okay?  Because there has

22   to be some proportionality applied here.  And if it's too

23   small of a sample, then we'll go to Plan B, okay.

24           What else?

25           MS. NEEL:  I think there is one other -- maybe two

1    other issues that I have up on my list.  One related to

2    Frontier's refusal to produce related documents for many of

3    our requests.  So Frontier has agreed to produce some

4    policies or lists, but has refused to produce documents

5    related to those policies.  For example, correspondence about

6    a policy that may or may not have been put in place or

7    discussion, memos, e-mails, correspondence, discussing the

8    policies that are at issue in this -- in this case.

9              THE COURT:  Well, you've asked just for policies

10   that relate to the material issues in the case; is that

11   right?

12             MS. NEEL:  Maybe Ms. Sherwin could help here for a

13   moment, Your Honor.

14             MS. SHERWIN:  Yeah.  No, Your Honor, we have asked

15   for related documents.  So we've asked for the policies as

16   well as documents and materials.

17             THE COURT:  Well, I know, but to start with the

18   basic set of documents, and that is, policies relating to the

19   issues that you raise in the complaint.

20             MS. SHERWIN:  Yes.  So policies relating to

21   maternity, lactation accommodation, training materials and

22   policies relating to use of breaks while on duty are sort of

23   two categories.  We've asked for the lactation facility list.

24   We've asked for documents relating to requests for ground

25   position, and the policies relating to use -- to the use or

1    approval of portable electronic devices.  So there are sort

2    of a bunch of different categories of documents.  We've

3    sought policies and then related documents or list of related

4    documents.  And related documents would encompass things such

5    as correspondence.

6            So an example would be, for example, if, you know,

7    in response to the requests related to the lactation

8    facilities listed at other airports, they've offered to give

9    us solely the list itself.  You know, obviously it would be

10   relevant to plaintiffs' claims if there were a lot of

11   correspondence between Frontier and another airport regarding

12   the feasibility of installing an Ameda unit, you know, a

13   portable lactation room there.  That is going to go to some

14   central issues relevant to plaintiffs' claims including

15   whether there is a less discriminatory alternative, whether

16   the accommodations requested are reasonable, et cetera, et

17   cetera.  So there is really no basis to limit the response to

18   the policies or lists themselves.

19           Obviously correspondence, memos, analysis,

20   spreadsheets tracking other accommodation requests, none of

21   that would be encompassed in the response that the defendant

22   is proposing to produce, but all of that would be highly

23   relevant and probative in the case potentially.

24           MR. BAUMANN:  So, Your Honor, like I believe it was

25   Ms. Sherwin who said that we would agree to produce all the

1   relevant policies and we have done that.  Or we're in the

2   process of doing that.  The problem is with these documents

3   surrounding the policies, there is this all-encompassing term

4   concerning, and we're trying to come up with a way that is

5   proportional to the needs of this case that is not overbroad

6   and unduly burdensome to capture this --

7         THE COURT:  How about interpreting or applying?

8         MR. BAUMANN:  And so one of the things that

9   Frontier has offered to do is to get communications with the

10   union, the negotiations over these policy, quote/unquote,

11   that are in the collective bargaining agreement, and so the

12   interpreting and applying, I think, would capture that as

13   well.

14         THE COURT:  Well, yeah, but you're not going to

15   share with the union what you might discuss internally.

16         MR. BAUMANN:  Oh, no.

17         THE COURT:  You're not going to be as open and

18   forthcoming with the union as you would be talking in

19   internal memo about why do we have to give these dang ladies

20   so much time off when they are pregnant and nursing, right?

21         MR. BAUMANN:  Sure.  And so some of that, and maybe

22   much of that, interpreting and applying the policy may be

23   protected by the attorney-client privilege.

24         THE COURT:  Could be.  Yeah.  That's why we create

25   privilege logs, right.

1            MR. BAUMANN:  Oh, sure, I believe the parties have

2    agreed to waive those in this case, but beyond that issue.

3            THE COURT:  Would you.  Okay.

4            MS. SHERWIN:  The parties have not agreed to waive

5    privilege logs at large.  We've reached a limited agreement

6    regarding privilege logs regarding privilege directly,

7    communications directly with the client and their attorney.

8    So, you know, there would be, however, obviously a review for

9    privilege that takes place in the course of determining --

10   determining responsive documents and the real -- the

11   appropriate method for limiting the production would be to

12   agree to search terms, which is -- you know, brings us back

13   to the first item we discussed today.

14           MR. BAUMANN:  Right, Your Honor, and that was the

15   second point of what I was going to address.  In our

16   submission, we said we would be happy to run tailored search

17   terms, but like I mentioned -- so I'm looking at the ESI

18   protocol the plaintiffs submitted and one of the policies

19   terms is policy and flight attendant, which is obviously way

20   too overbroad.  So if we have narrowed search terms that go

21   to applying or interpreting, we would be happy to run those,

22   but that's the whole problem, we don't have narrowly tailored

23   search terms that go to the specific issues here that are

24   proportional to the needs and not overly broad and unduly

25   burdensome.

1        THE COURT:  I agree, so you need to do the right

2   search terms.  But I think internal memos, correspondence,

3   communications with airports about these issues, that's for

4   the reasons Ms. Sherwin said, it's discoverable, but you've

5   just got to narrow it other than -- better than documents

6   relating to, okay.

7        But I believe if there are such documents that

8   address those issues, they -- they're probably captured by

9   some other request for production anyway, so you might as

10  well do it for this one, but that's -- you need to get back

11  to me then on the final ESI protocol.  If you come to a

12  point -- I don't know want to do this, but if you come to a

13  point where you have two competing versions, hopefully the

14  differences are narrow, then you can submit it to me one

15  document, and if any one provision has competing language,

16  then I'll just choose the language.  Okay?

17        MR. BAUMANN:  And, Your Honor, quick, on the ESI

18  protocol as well related to this, Frontier had proposed a

19  two-tier approach.  So once we come to terms with what the

20  search terms are, we run it to see how many hits there are.

21  So if, for example, we run policies and flight attendants

22  there are 300,000 hits, then we negotiate from there to make

23  sure we're not unduly burdening anybody.

24        THE COURT:  Hard to argue with that.  What was

25  their response?

63

1          MS. NEEL:  I don't recall.

2          MS. SHERWIN:  Your Honor, we agreed to that -- we

3   agreed to that position.  This is Ms. Sherwin.  We agreed to

4   that proposal.  We also -- I mean, we proposed that the

5   documents be reviewed for responsiveness in addition to, you

6   know, being assessed for the burden.

7          THE COURT:  Well, yeah, if you've got 300,000

8   documents and you've still got to review them for responsive,

9   you've just -- you've just wasted the whole reason to try and

10  narrow the search anyway.  I don't understand what you're

11  saying.

12         MS. NEEL:  I think she was just saying there was

13  two separate issues.  One issue was --

14         MS. SHERWIN:  Yes.

15         MS. NEEL:  -- if there was too many hits, we will

16  reevaluate.

17         THE COURT:  Right.

18         MS. NEEL:  And then another thing that we had

19  proposed was relevancy.  Once we get it down to a reasonable

20  number of hits and we can review for relevancy as well.

21         THE COURT:  You mean the producing party reviews

22  for relevance?

23         MS. NEEL:  Yes.

24         THE COURT:  But that would always be the case.  I

25  don't even know why you have to say that.  You don't have any

64

1   obligation to produce irrelevant information.  That's the

2   law.

3           MS. NEEL:  We agree, Your Honor.

4           THE COURT:  All right, okay, that should be a good

5   one then.  What else?

6           MS. NEEL:  The last thing I have on my list, and my

7   colleagues can correct me if I'm wrong, is an issue related

8   to class member contact information and I believe Ms. Turner

9   is going to handle this as our in-house class action

10  specialist.

11          THE COURT:  Finally we're moving towards justice.

12  Go ahead, Ms. Turner.

13          MS. TURNER:  I feel like I have to live up to my

14  billing here, thank you.

15          So, Your Honor, our understanding in a number of

16  the confer calls thus far, Frontier is seeking the position

17  that, you know, to the extent that our requests call for

18  production of contact information from members of the

19  putative classes, Frontier will not produce that information,

20  and it's our position that the contact information of these

21  individuals is relevant to the class certification as they

22  are all potential witnesses who may have information relative

23  to the -- relevant to the claims in the case.

24          In particular, how the policies at issue were

25  applied to them, what happened, for instance, when they

1    sought accommodation, or they if they sought leave, you know,

2    or belief from the dependability policy relating to their

3    pregnancy and what their an anecdotal experience was.

4          And this information is relevant to our anticipated

5    motion for class certification, particularly as to the

6    disparate treatment claim, but, you know, in general, I think

7    courts typically order production of this type of information

8    prior to class cert.

9          Particularly whereas here it's a relatively small

10   class -- that's our understanding, probably less than 100

11   people -- and so there is, you know, no particular burden

12   associated with producing that information.

13         THE COURT:  Wait.  So you're asking for contact

14   information?

15         MS. TURNER:  That's correct, Your Honor.

16         THE COURT:  And your objection is what?

17         MR. BAUMANN:  So my understanding, Your Honor, and

18   that's why we didn't address it in our submission is that we

19   had resolved this issue because I note on page 4 of

20   plaintiffs' own submission about the de-identified

21   information.  I thought we had agreed that we were going to

22   produce de-identified information without contact information

23   for these individuals, but if that's no longer the case --

24         THE COURT:  What does de-identified mean?

25         MR. BAUMANN:  Meaning crossing out the name or the

1    cellphone number or something like that.

2            THE COURT:  Oh.

3            MS. TURNER:  I think -- my understanding is that

4    that relates in particular to production of, for example, if

5    we were to receive the information that Ms. Sherwin was just

6    talking about, information about class members' salaries, you

7    know, their dates of employment, that type of information is

8    a little more a sensitive nature, that it wouldn't

9    necessarily be tied to their name so that there would be a

10   unique identifier.  This is I think a separate issue of

11   whether we'll be able to contact these potential witnesses to

12   discuss their experiences.

13           So my understanding is that we had agreed that to

14   the extent that, you know, HR and payroll data was produced

15   for these individuals, that there would be, you know, a

16   unique identifier that's not necessarily their name, but

17   separately, you know, we would be seeking their contact

18   information.

19           MR. BAUMANN:  So part of me is not prepared to

20   address that issue today because, like I said, I believed it

21   had been resolved; but even then, if I'm understanding what

22   plaintiffs are asking for, they're asking for a spreadsheet

23   with the names of people, and I just don't know what that

24   spreadsheet looks like, because again, we have the issue

25   like, is it everybody nationwide, is it everybody out of

1    Denver, is it everybody who requested an accommodation, is it

2    everybody who was pregnant at a given time, is it everybody

3    who was pregnant like between 2010 and 2020.  Like they're

4    just --

5            THE COURT:  Ms. Turner, what is it?

6            MS. TURNER:  I mean, we can certainly provide a --

7    you know, if it would be helpful to the production, we can

8    provide, you know, a very specific class, but basically what

9    we want is a class contact list.  So, you know, name, phone

10   number, address, e-mail for all the individuals who fall

11   within the putative class as we said them.

12           THE COURT:  That's pretty simple, isn't it?

13           MR. BAUMANN:  Well, I guess, I'm back to, I don't

14   know what the class looks like.  Because my understanding is,

15   I think Ms. Neel said earlier, there are five or six folks,

16   including the four named plaintiffs to date, and so I don't

17   know where I would ask Frontier to pull the list from in like

18   the time periods and all of that.  If they're going to

19   provide that and I can talk to Frontier about that, that's

20   great, we're happy to do that.

21           THE COURT:  Okay, let's have them do that.  Provide

22   it in writing, your specific, as broad as you can identifiers

23   of people you want information produced for, okay?

24           MS. TURNER:  Sure, we'll do, Your Honor, thank you.

25           THE COURT:  After looking at that, you say -- I

1  mean, have a back and forth interactive process and try to

2  figure out what they're asking for and that you would have

3  records that would segregate people in that manner, because

4  if you don't have records that would segregate people in that

5  manner, you just can't do that, right?

6        MR. BAUMANN:  Right, and I think, Your Honor,

7  that's one of the reasons we agreed to provide the personnel

8  files for those who had sought accommodation as some measure

9  of something that we could say, Okay, here are these folks.

10       THE COURT:  Right.

11       MR. BAUMANN:  But we agree with you.

12       THE COURT:  But I mean, if it's the name of

13  everybody that got pregnant and had to take unpaid leave

14  starting at 32 weeks, that's probably discernable, isn't it?

15       MR. BAUMANN:  I would hope so, but I don't know off

16  the top, Your Honor.

17       THE COURT:  We don't know what we don't know.

18       MS. TURNER:  I mean, Your Honor, I think oftentimes

19  an employer will have an indication if somebody is, you know,

20  is like -- if they indicated a pregnancy, certainly for an

21  airline, we would expect that given there are some safety

22  concerns associated with, you know, (inaudible) flight, that

23  they would have a record of that somewhere in some of their

24  HR databases, but we're happy to meet and confer with counsel

25  about how best to come up with the information that we're

69

1    seeking.

2              THE COURT:  Right.  So just as a general matter, I

3    don't think the discovery should be that difficult here in a

4    case like this, because my understanding of Frontier's

5    position is they believe they have very valid defenses on the

6    law, so let's let the law decide this thing, right.  And the

7    plaintiffs disagree.  So it shouldn't -- I think my

8    recollection of the settlement negotiations is you guys are

9    basically operating under the same facts, you just disagree

10   with what the consequence will be of those facts, right.

11             So I mean, this is deals mainly with the pilots,

12   but you have a pretty (inaudible) argument that you can't let

13   certain machines into the cockpit and, you know, have a

14   person who might be suffering from 30 minutes of fatigue be a

15   copilot.  I understand that.  Now, whether a jury agrees or

16   not, that's going to be the issue, right, but I don't think

17   the facts are that disputed in this case generally.  So just

18   get discovery out of the way and get the case tried, all

19   right.

20             Anything else from the plaintiff.

21             MS. NEEL:  Nothing from the plaintiff, Your Honor.

22             THE COURT:  Thank you for coming in today.

23             MS. SEBASKI:  Actually, this is Ms. Sebaski.  I had

24   a one clarification for an issue that we were discussing

25   earlier.  Mr. Baumann recently mentioned the personnel files

1   for those who have requested accommodations that Frontier has

2   agreed to produced related to the issue we discussed about

3   production of policies or lists.  So requests for personnel

4   files are relevant.

5          We haven't gotten confirmation from Frontier that

6   they would search for responsive documents outside of those

7   personnel files except as to communications with the named

8   plaintiffs and to two other individuals, Joe Roby (ph) and

9   Tricia Hughes Drawn (ph), so we would -- we're also looking

10  for related documents insofar as they're outside of the

11  personnel files or concerning the individuals who are not

12  necessarily communications on which they're copied.

13         MR. BAUMANN:  I apologize.

14         THE COURT:  Did you get all that?

15         MR. BAUMANN:  So I'm not sure I totally follow.  So

16  for folks -- well, let's take it two steps at a time.  So for

17  plaintiffs and the two individuals who they've identified as

18  putative class members, we've gone broad and said, Here are

19  all communications with them, period.  We don't even need the

20  search terms, like, Here you go, have at it.

21         For folks beyond those six folks, we're producing

22  the personnel files for those who are accommodated, and that

23  would include the information of our request for

24  accommodation, whether it was granted or denied and stuff

25  like that.  If there are communications beyond that, then

1    we're back to the ESI protocol that we started with today

2    that I understand the parties were going to negotiate and

3    figure out.

4              THE COURT:  Is what he said true?

5              MS. SEBASKI:  Yes, as long as they're willing to

6    negotiate ESI search terms related to and then run these

7    terms on documents outside of personnel files, that's fine.

8              THE COURT:  They're always happy to negotiate those

9    things.  Okay.  Thank you, you guys, take care

10             (Whereupon, the within hearing was then in

11   conclusion at 12:28 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

72

1                    TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    May 5, 2021

8    Signature of Transcriber          Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25